FILED
U.S. DIST
DISTRICT

OCT 21 2010

Stephan Harris Clerk
Cheyenne

Mary Throne
Throne Law Office, P.C.
P.O. Box 828
211 W. 19th St.
Cheyenne, WY 82003
Telephone: 307-637-2822
Facsimile: 307-674-6104

Ezekiel J. Williams, pro hac vice
Steven K. Imig, pro hac vice
Ducker Montgomery, Lewis
& Bess, P.C.
1560 Broadway, Suite 1400
Denver, CO 80202
Telephone: 303-861-2828
Facsimile: 303-861-4017

*Attorneys for Plaintiff Western Energy Alliance*

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| WESTERN ENERGY ALLIANCE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| KEN SALAZAR, in his official | ) |
| capacity as United States Secretary | ) |
| of the Interior, | ) Case No. *10 - CV-237F* |
| | ) |
| and | ) |
| | ) |
| UNITED STATES BUREAU OF LAND | ) |
| MANAGEMENT, | ) |
| an agency of the United States Department | ) |

| | |
|---|---|
| of the Interior, | ) |
| | ) |
| and | ) |
| | ) |
| ROBERT V. ABBEY, in his official | ) |
| capacity as Director of the Bureau of | ) |
| Land Management, | ) |
| | ) |
| and | ) |
| | ) |
| UNITED STATES FOREST SERVICE, | ) |
| an agency of the United States | ) |
| Department of Agriculture, | ) |
| | ) |
| and | ) |
| | ) |
| THOMAS TIDWELL, in his official | ) |
| Capacity as Chief of the United States | ) |
| Forest Service, | ) |
| | ) |
| Defendants. | ) |

## COMPLAINT

1. This lawsuit requests the Court to declare invalid, contrary to law, and arbitrary and capricious, rules issued by the United States Bureau of Land Management ("BLM") and United States Forest Service ("Forest Service") that direct federal employees to ignore statutory provisions in Section 390 of the Energy Policy Act of 2005, 42 U.S.C. § 15942 ("Section 390"). The rules appear in an instructional memorandum issued by the BLM on May 17, 2010, and in an instruction memorandum issued by the Forest Service on June 9, 2010 (together, the "New Rules"). Section 390 exempts five minimally intrusive development activities on federal oil and gas leases issued by the United States Department of the Interior from the procedural

requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4332, but not from any other law or requirement. Congress enacted Section 390 to direct federal land managers to streamline energy development in five clearly specified situations where the environmental impact is minimal, where a NEPA document has already been prepared, or both. Congress did not limit the application of the statutory Section 390 exclusions from NEPA to instances where no potential "extraordinary circumstances" exist as must federal agencies when deciding whether to exclude themselves from NEPA based on a self-created regulation. The New Rules are arbitrary and capricious because the BLM and Forest Service are prohibiting the use of the statutory Section 390 exclusions based on conditions that do not appear in the statute. The BLM has negated Section 390 itself by transforming two of the Section 390 exclusions from NEPA into categorical obligations to *comply* with NEPA. The BLM and Forest Service adopted the New Rules to implement a settlement agreement entered into by the BLM in violation of federal law. The New Rules reverse the agencies' settled interpretation of Section 390, are binding on federal agency employees, and were adopted without public notice or an opportunity for public comment in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553. The Court should issue a nationwide injunction to enjoin the application of the unlawful New Rules by the BLM and Forest Service.

## JURISDICTION AND VENUE

2. This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e).

**PARTIES**

4.    Plaintiff Western Energy Alliance ("Western Energy") is based in Denver, Colorado. Western Energy is a non-profit trade association representing over 400 companies engaged in all aspects of environmentally responsible exploration and production of oil and natural gas in the Intermountain West. Western Energy members own federal oil and gas leases in many states, including Wyoming, which the Department of the Interior has issued under the Mineral Leasing Act of 1920. Federal oil and gas leases owned by Western Energy members are subject to the five statutory categorical exclusions from NEPA ("Statutory CXs") established by Congress in Section 390. Western Energy members have submitted numerous applications for permits to drill oil and gas wells on federal lands that the BLM and Forest Service authorized based upon Section 390. Western Energy members intend to submit future applications for permits to drill oil and gas wells on federal leases that qualify for the Statutory CXs as provided by Section 390.

5.    For example, QEP Resources, Inc. ("QEP") is a natural gas and oil exploration, development and production company. QEP is a member of Western Energy. QEP is engaged in the exploration and development of oil and gas resources from federal leases in Wyoming, Colorado, Utah, and other states. The BLM has authorized applications for permits to drill ("APDs") oil and gas wells submitted by QEP based on Section 390. QEP plans to submit future APDs that qualify for exclusions from NEPA review under Section 390. QEP is harmed by the New Rules because Congress has mandated that Section 390 be used when APDs meet the criteria in order to streamline the regulatory process. The BLM has ignored that mandate. QEP

is harmed by the limitations that the New Rules place on the use of Section 390 because the BLM will not use a Congressionally-mandated statutory tool.

6. Devon Energy Production Company, L.P. ("Devon") is a natural gas and oil exploration, development and production company. Devon is a member of Western Energy. Devon is engaged in the exploration and development of oil and gas resources from federal leases in Wyoming, Montana, Utah, and New Mexico. The BLM has authorized APDs for oil and gas wells submitted by Devon based on Section 390. Devon plans to submit future APDs that qualify for exclusions from NEPA review under Section 390. Devon is harmed by the New Rules because Congress has mandated that Section 390 be used when APDs meet the criteria in order to streamline the regulatory process. The BLM has ignored that mandate. Devon is harmed by the limitations that the New Rules place on the use of Section 390 because the BLM will not use a Congressionally-mandated statutory tool.

7. Laramie Energy II, LLC ("Laramie") is a natural gas and oil exploration, development and production company. Laramie is a member of Western Energy. Laramie is engaged in the exploration and development of oil and gas resources from federal leases in Colorado, including leases with surface managed by the Forest Service and leases with the surface managed by the BLM. The BLM has authorized APDs to drill oil and gas wells submitted by Laramie based on Section 390. The Forest Service has authorized actions by Laramie based on categorical exclusions. Laramie plans to submit future APDs that qualify for exclusions from NEPA review under Section 390. Laramie is harmed by the New Rules because Congress has mandated that Section 390 be used when APDs meet the criteria in order to

streamline the regulatory process. The BLM and Forest Service have ignored that mandate. Laramie is harmed by the limitations that the New Rules place on the use of Section 390 because the BLM and Forest Service will not use a Congressionally-mandated statutory tool.

8.     Defendant Ken Salazar is sued in his official capacity as the Secretary of the United States Department of the Interior. Mr. Salazar is responsible for overseeing the BLM and for applying federal laws and regulations to oil and gas development on federal lands, including Section 390.

9.     Defendant United States Bureau of Land Management is the federal agency charged with managing approximately 245 million surface acres of land owned by the United States as well as approximately 700 million acres of minerals owned by the United States, including the federal minerals under surface managed by the BLM, and federal minerals under the surface of National Forest System lands managed by the Forest Service. The BLM promulgated an unlawful rule interpreting Section 390 that is the subject of this lawsuit and that is attached as Exhibit D.

10.     Defendant Robert V. Abbey is sued in his official capacity as the Director of the BLM. Mr. Abbey is responsible for managing BLM lands and minerals in accordance with applicable laws and regulations, including Section 390.

11.     Defendant United States Forest Service is the federal agency charged with managing the surface of approximately 193 million acres of National Forest System Lands, including the surface of National Forest System lands over minerals managed by the BLM. The

6

Forest Service promulgated an unlawful rule interpreting Section 390 that is the subject of this lawsuit, and that is attached as Exhibit E.

12. Defendant Thomas Tidwell is sued in his official capacity as Chief of the Forest Service. Mr. Tidwell is responsible for managing the approximately 193 million acre National Forest System in accordance with applicable laws and regulations, including Section 390.

## BACKGROUND

13. The approximately 700 million acres of federal lands and minerals owned by the United States contain vast amounts of recoverable oil and gas. The U.S. Departments of the Interior, Agriculture, and Energy recently completed an inventory of federal onshore oil and gas resources. The agencies concluded that: "Total proved reserves under these Federal lands total 5.3 billion barrels of oil and 68.8 trillion cubic feet of natural gas." See Scientific Inventory of Onshore Federal Lands' Oil and Gas Resources and Restrictions to Their Development – Phase III Inventory (2008) at xxviii.[1]

14. Western Energy members and other American oil and natural gas producers deliver a significant amount of oil and gas to Americans from a relatively small amount of federal lands under managed conditions that protect the environment. Of the 700 million acres of minerals managed by the BLM, only about 470,000 acres, or 0.07%, are disturbed by oil and gas activities. See BLM, Facts About Federal Energy Leasing and Development (Updated 2010).[2] Federal lands in Wyoming and other states provide a significant amount of clean-burning natural gas, fully 6.6 trillion cubic feet or 32% of total domestic natural gas production

---

[1] *Available at* http://www.blm.gov/wo/st/en/prog/energy/oil_and_gas/EPCA_III.html.

[2] *Available at* http://www.blm.gov/pgdata/content/wo/en/info/newsroom/Energy_Facts_07.html.

7

in 2009. U.S. Energy Information Administration, Annual Energy Review 2009 tbl. 1.14 (Aug. 2010).

15.     Production of oil and gas from federal lands provides federal, state, and local governments with tax revenues and royalties and creates hundreds of thousands of jobs. For example, oil and gas activity on federal onshore lands generated nearly $3 billion in royalties, rents and bonuses in fiscal year 2009. See U.S. Department of the Interior Office of Natural Resources Revenue, Reported Royalty Revenue - Fiscal Year 2009.[3]  Production of oil and gas from federal lands reduces the United States' dependence on foreign sources of energy.

### Oil and Gas Development on Federal Lands

16.     The Mineral Leasing Act of 1920, 30 U.S.C. §§ 181-287, authorizes the Secretary of the Interior to issue oil and gas leases to private parties that grant them the right to explore for and develop federally-owned oil and gas resources. A federal oil and gas lease grants the lessee the exclusive right to produce oil and gas, subject to extensive regulation of the subsurface mineral development by the BLM, and extensive regulation of the surface development by the federal agency with surface management authority (usually the BLM or the Forest Service). See 43 C.F.R. Part 3100 (BLM); 36 C.F.R. Part 228 (Forest Service); Onshore Order Number 1, 72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007).

17.     The BLM conducts a three phase decision-making process to authorize oil and gas development on federal lands, only a small portion of which Congress altered in Section 390.

---

[3] *Available at* http://www.mrm.boemre.gov/MRMWebStats/Home.aspx.

Section 390 does not affect the first and second phases. Section 390 affects only the third phase

for five defined development activities on federal oil and gas leases.

### Phase One – Federal Land Use Planning.

18.    In the first phase, the BLM prepares a comprehensive land use plan and

Environmental Impact Statement ("EIS") that analyzes, at a broad scale, the foreseeable effects

of oil and gas leasing and development on federal lands. The Federal Land Policy and

Management Act of 1976 ("FLPMA"), 43 U.S.C. §§ 1701-1782, directs the BLM to manage

public lands for "multiple use and sustained yield," including for development of "domestic

sources of minerals." 43 U.S.C. §§ 1701(a)(12), 1732. The BLM must develop and maintain

federal land use plans called resource management plans ("RMPs") that describe allowable uses

of the land, goals for the land's future condition, and specific next steps for the BLM to take.

See 43 U.S.C. § 1712; 43 C.F.R. Part 1600, Subpart 1601. The RMP allocates certain lands as

open for oil and gas leasing and development, prohibits leasing in other areas, and determines

appropriate land use restrictions and oil and gas leasing and development conditions that are

necessary and appropriate to meet federal goals and ensure adequate environmental protection.

43 C.F.R. § 1610.3-2; BLM Land Use Planning Handbook, H-1601-1, IIB.

19.    As part of the first phase, the BLM prepares an EIS under NEPA to analyze the

proposed RMP and alternatives with substantial public involvement. 43 C.F.R. §§ 1601.0-6,

1610.2. The EIS analyzes, at a landscape level, the reasonably foreseeable environmental effects

of oil and gas development on federal lands over a 15 to 20 year period. The EIS projects the

foreseeable effects of oil and gas development on federal lands on wildlife, vegetation, air

9

quality, water quality, soils, socioeconomics, and other resources. Section 390 does not affect the preparation of the EIS for the RMP.

### Phase Two – Leasing Decision.

20.    In the second phase, the BLM leases federal lands that are made available for oil and gas leasing and development in the RMP at a competitive lease sale. 30 U.S.C. § 226(a)-(b). If the surface of the land to be leased is managed by the Forest Service, the BLM must obtain the Forest Service's consent prior to leasing. 30 U.S.C. § 226(h). When it issues a lease, the BLM attaches stipulations to the lease required by the RMP and that the surface management agency (such as the Forest Service) deems necessary to protect surface resources such as wildlife. Before the BLM offers leases for sale, it conducts a lease parcel review to determine whether offering the parcel is consistent with the existing RMP and if the environmental effects of oil and gas leasing and development of the parcel was analyzed in the EIS for the RMP. Section 390 does not affect the BLM's decision-making process in issuing leases.

### Phase Three – Site-Specific Development.

21.    The third phase is site-specific authorization of development. The BLM and project proponent prepare a site-specific proposal to minimize, mitigate and avoid impacts to other resource values. Before commencing "drilling operations" or "surface disturbance preliminary thereto", an oil and gas lessee must obtain BLM approval of an APD. 43 C.F.R. § 3162.3-1(c). The operator must submit a surface use plan which specifies, among other things, the location of facilities and roads, reclamation plans, and plans for the management and disposal of waste. Id. § 3162-1(f). Information concerning each APD must be posted for public

10

inspection for at least 30 days in the offices of both the BLM and the relevant surface management agency (if not the BLM). 43 C.F.R. § 3162.3-1(g). The BLM must consult with other agencies on an APD, including the U.S. Fish and Wildlife Service, state game and fish agencies, state historic preservation offices, and other government entities. Following this consultation, the BLM may approve the application as submitted, attach additional conditions of approval, or deny the application. Id. § 3162.3-1(h).

22.     In the third phase, prior to approving an APD, the BLM conducts a site-specific NEPA review of the proposal, and prepares either an EIS or Environmental Assessment ("EA") to analyze the reasonably foreseeable effects of the development proposal, as well as alternatives. See Onshore Order Number 1, 72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007). The BLM determines if there is existing NEPA analysis that covers the project that enables them to approve the APD without further review. See BLM NEPA Handbook, H-1790-1 § 5.1. The BLM's decision on an APD is subject to administrative appeal within the agency, and thereafter to judicial review under the APA, 5 U.S.C. § 706.

23.     The third phase differs slightly for development of a federal oil and gas lease on National Forest System lands from development on BLM lands because the Forest Service, rather than the BLM, regulates the surface. When a lessee submits an APD to the BLM to drill an oil or gas well on National Forest System lands, the lessee must also submit a surface use plan of operations ("SUPO") to the Forest Service. 36 C.F.R. § 228.106(a); 43 C.F.R § 3162.3-1(h). A SUPO is a "plan for surface use, disturbance, and reclamation" that the Forest Service must approve before "a permit to drill on a Federal oil and gas lease on National Forest System lands

may be granted" by the BLM. 36 C.F.R. §§ 228.101, 228.106(a). No development activities may occur until the Forest Service approves the SUPO. Id. § 228.106(a). Prior to approving a SUPO, the Forest Service conducts a site-specific NEPA review of the proposal, and prepares (often in conjunction with the BLM) either an EIS or EA to analyze the reasonably foreseeable effects of the development proposal, as well as alternatives. Onshore Order Number 1, 72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007). The Forest Service's decision on a SUPO is subject to administrative appeal under 36 C.F.R. Part 215, and thereafter to judicial review under the APA, 5 U.S.C. § 706.

24.    NEPA review by the BLM and Forest Service can provide important benefits, but it is also costly, time consuming, potentially redundant with existing NEPA documents, and consumes agency resources that could be diverted to on-the-ground monitoring and other activities. EAs for oil and gas development projects may take over four years, and EIS's may take seven years or more.

25.    In the third phase, the BLM and Forest Service ensure that a decision to authorize an APD or a SUPO complies with federal, state, and local laws and regulations, including the Clean Water Act (33 U.S.C. §§ 1251-1387), Clean Air Act (42 U.S.C. §§ 7401-7671q), Endangered Species Act (16 U.S.C. §§ 1531-1599), National Historic Preservation Act (16 U.S.C. §§ 470-470x-6), conditions imposed under BLM or Forest Service land use plans, applicable state environmental laws, rules of state oil and gas commissions, and other applicable requirements. See Onshore Order Number 1, 72 Fed. Reg. 10,308, 10,334 (Mar. 7, 2007); 36

12

C.F.R. § 228.107(a)(1). Section 390 does not alter the obligation of the BLM and Forest Service to comply with these laws, rules, and regulations.

Statutory and Administrative Categorical Exclusions from NEPA

26.     NEPA requires federal agencies to prepare and circulate for public review and comment an EIS for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(c); 40 C.F.R. § 1501.4. The EIS must identify environmental impacts and consider alternatives to the proposed action. 42 U.S.C. § 4332(2)(c). If an agency is unsure whether the proposed action requires an EIS, it may prepare an EA to determine whether the action may have a significant effect on the environment. 40 C.F.R. § 1501.4.

27.     Not all federal actions require preparation of an EA or EIS. First, Congress may exempt specific actions from the requirements of NEPA for any reason, including when Congress determines that doing so will help achieve other federal policies. For example, in the Stafford Act, Congress provided that certain disaster relief efforts are not subject to NEPA review. See 42 U.S.C. § 5159. Congress exempted certain actions taken pursuant to the Clean Air Act and Clean Water Act from NEPA. See 15 U.S.C. § 793(c); 33 U.S.C. § 1371(c)(1). And Congress has exempted specific projects like the Trans-Alaska Pipeline from the requirements of NEPA. See 43 U.S.C. § 1652(c). Second, certain categories of actions may be categorically excluded from the requirements of NEPA by an administrative agency if the agency determines the category of actions does not have significant effects and does not trigger NEPA in the first place. See 40 C.F.R. § 1508.4.

13

28.     Statutory CXs and administrative CXs are fundamentally different because they arise from different branches of the federal government.  Congress is free to exempt certain activities from NEPA, just as Congress is free to limit the application of other laws.  When Congress exempts an action from NEPA, the executive branch cannot second-guess Congress and decide that NEPA should apply anyway.  Administrative CXs are different from Statutory CXs.  Administrative CXs are, by definition, established by federal agencies who, unlike Congress, do not have plenary authority to determine the application of a statute.  CEQ regulations direct federal agencies to define "a category of actions which do not individually or cumulatively have a significant effect on the human environment."  40 C.F.R. § 1508.4.  Because an agency may not exempt itself from NEPA, however, the agency must have a procedure for determining whether the presence of environmental "extraordinary circumstances" brings the normally excluded activity back within the ambit of the statute because the activity may have a significant effect on the environment, the trigger for NEPA.  CEQ regulations require this extraordinary circumstances review for administrative CXs developed by agencies but not for Statutory CXs.  See 40 C.F.R. § 1508.4.

## The Energy Policy Act of 2005

29.     Congress altered the third phase of the oil and gas development process used by the BLM and the Forest Service for five specific actions in the Energy Policy Act of 2005, enacted July 29, 2005.  The Act was signed into law on August 8, 2005.  In Section 390, Congress amended NEPA and established five Statutory CXs for five defined oil and gas exploration and development activities authorized by the BLM and Forest Service on federal

14

lands and minerals leased under the Mineral Leasing Act of 1920. See 42 U.S.C. § 15942. The

Section 390 CXs exempt five specific development actions from review under NEPA.

      30.    Section 390 provides: "Action by the Secretary of the Interior in managing the

public lands, or the Secretary of Agriculture in managing National Forest System Lands, with

respect to any of the activities described in subsection (b) shall be subject to a rebuttable

presumption that the use of a categorical exclusion under [NEPA] would apply . . . ." Id. The

five enumerated activities in "subsection (b)" are:

    a.  "Individual surface disturbances of less than 5 acres so long as the total

        surface disturbance on the lease is not greater than 150 acres and site

        specific analysis in a document prepared pursuant to NEPA has been

        previously completed." Id. § 15942(b)(1) ("Statutory CX1").

    b.  "Drilling an oil or gas well at a location or well pad site at which drilling

        has occurred previously within 5 years prior to the date of spudding the

        well." Id. § 15942(b)(2) ("Statutory CX2").

    c.  "Drilling an oil or gas well within a developed field for which an approved

        land use plan or any environmental document prepared pursuant to NEPA

        analyzed such drilling as a reasonably foreseeable activity, so long as such

        plan or document was approved within 5 years prior to the date of

        spudding the well." Id. § 15942(b)(3) ("Statutory CX3").

d. "Placement of a pipeline in an approved right-of-way corridor, so long as the corridor was approved within 5 years prior to the date of placement of the pipeline." Id. § 15942(b)(4) ("Statutory CX4").

e. "Maintenance of a minor activity, other than any construction or major renovation of a building or facility." Id. § 15942(b)(5) ("Statutory CX5").

31.     The Statutory CXs limit only NEPA paperwork by exempting the covered activities from site-specific NEPA review. See 42 U.S.C. § 15942. Section 390 does not limit the application of any other applicable law, regulation, or policy. Id. For example, Section 390 does not exempt the covered activities from review and regulation under the Endangered Species Act, the National Historic Preservation Act, the Federal Land Policy Management Act, the National Forest Management Act, the Clean Air Act, or the Clean Water Act. The Statutory CXs do not limit the authority of the BLM and Forest Service to impose conditions of approval on APDs to ensure environmental protection.

32.     The five Statutory CXs encourage energy development where the environmental impact is minimal, where drilling was previously analyzed in a NEPA document, or both. The Statutory CXs eliminate redundant environmental analysis, encourage companies to minimize surface impacts, and free up federal resources for monitoring and other activities.

### First BLM and Forest Service Interpretation of the Statutory CXs

33.     The BLM and Forest Service adopted nationwide guidance to administer the Statutory CXs in 2005. That guidance faithfully gave effect to Section 390.

16

34.     The BLM interpreted the Statutory CXs in a 2005 guidance document (the "2005

BLM Guidance") that gives effect to the unambiguous language Congress chose. See BLM Inst.

Mem. No. 2005-247 (Sept. 30, 2005), attached at Exhibit B. Because the CXs are statutory, the

BLM appropriately determined that internal agency restrictions on the use of administrative CXs,

and restrictions in the CEQ regulations for use of CXs (such as extraordinary circumstances

review) do not apply. According to the BLM:

> if one or more of five statutorily-created CXs applies to a proposed activity, Field
> Officials are not to use the existing CX review process or apply the extraordinary
> circumstances in 516 Department Manual . . . Field Offices are advised not to
> prepare a NEPA document in lieu of appropriately applying the statutory CXs.

Exhibit B, att. 2 at 2-1 to 2-2.

35.     The 2005 BLM Guidance contained additional specific instruction for the use of

each Statutory CX. For example, the guidance stated that for Statutory CX2, "the drilling of a

well at an existing location or well pad and the five year limitation are the only two applicable

factors for review pursuant to this statute, but must both be satisfied in order to use this CX."

Exhibit B, att. 2 at 2-3. The 2005 BLM Guidance stated that use of Statutory CX3, requires that

"[t]here is an existing NEPA document (including that supporting a land use plan) that contains a

reasonably foreseeable development scenario broad enough to encompass this action." Id.

36.     Like the BLM, the Forest Service interpreted the Statutory CXs in a November

22, 2005 memorandum to regional foresters (the "2005 Forest Service Guidance") that gives

effect to Section 390. See Forest Service Nov. 22, 2005, Letter to Regional Foresters, attached

as Exhibit C. Deputy Chief of the Forest Service Joel Holtrop wrote:

17

In Section 390, Congress replaced the standard procedural mechanism for
compliance with NEPA. The categorical exclusions addressed in this guidance
are established by statute and not under the Council for Environmental Quality
(CEQ) procedures pursuant to 40 CFR 1507.3 and 1508.4. Therefore, their use is
not dependent on the CEQ process for approving new categorical exclusions or
other NEPA procedures. . . . if one or more of the five statutory categorical
exclusions applies to a proposed activity, agency categorical exclusion direction .
. . or the extraordinary circumstances contained therein are not to be used.

Exhibit C, att. 2 at 2.

37.     The 2005 Forest Service Guidance contained specific instruction for the use of

each Statutory CX. For example, the guidance stated that for Statutory CX2: "The only

applicable factors for review in determining applicability for use pursuant to Section 390 are the

following two criteria . . . 1) drilling at a location or well pad previously drilled, and 2) five-year

limitation from previous drilling." Exhibit C at 4. The 2005 Forest Service Guidance states that,

for purposes of Statutory CX3, the "NEPA document can be of any type that analyzed drilling,

including that supporting a land use plan, regardless of whether it was prepared by the agency."

Exhibit C at 5.

### *Nine Mile Canyon Coalition et al. v. Steiwig, et al*

38.     The BLM and Forest Service abruptly changed their nationwide interpretation of

Section 390 as a result of a litigation settlement entered into by the BLM without public notice or

involvement.

39.     In 2008, the BLM approved an oil and gas development project in Utah based on

Statutory CX2. A coalition of environmental groups sued the BLM in the United States District

Court for the District of Utah on the grounds that the BLM should condition the use of Section

390 on the absence of "extraordinary circumstances" as required for administrative CXs. See Complaint, *Nine Mile Canyon Coalition et al. v. Steiwig, et al,* No. 2:08-cv-586 (D. Ut. Aug. 6, 2008).

40.    In March 2010, after the change in presidential administrations, the plaintiffs and federal defendants settled the lawsuit. See Notice of Voluntary Dismissal at Ex. A, *Nine Mile Canyon Coalition et al. v. Steiwig, et al,* No. 2:08-cv-586 (D. Ut. Mar. 30, 2010). The settlement agreement is attached as Exhibit F. Not all parties in *Nine Mile Canyon Coalition* agreed to the settlement. The proponent of the project that was the subject of the lawsuit was a party to the case but was not a signatory to the settlement. The settlement agreement bound the BLM to reverse its nationwide interpretation of Section 390. The settlement agreement requires the BLM to: "issue a new Instruction Memorandum modifying the Bureau of Land Management's ("BLM") NEPA Handbook and stating that future EPAct CXs will not be invoked absent a determination that there are no 'extraordinary circumstances.'" Exhibit F at 2-3. The court in *Nine Mile Canyon Coalition* did not approve the settlement agreement.

41.    The BLM agreed in the settlement agreement to adopt a new nationwide interpretation of Section 390. Exhibit F at 2-3. But the BLM did not provide prior public notice of or request public comment on the settlement agreement. The BLM never released the settlement agreement for public comment. The BLM did not involve the public in any way in development of the settlement agreement. The BLM committed to undo a federal statute of nationwide application in a private negotiation behind closed doors with three environmental groups in Utah.

### The BLM and Forest Service Reverse Themselves

42. In 2010, after the BLM committed to do so in the *Nine Mile Canyon Coalition* settlement agreement, the BLM reversed the 2005 BLM Policy and the Forest Service reversed the 2005 Forest Service Policy, and both agencies adopted the substantive New Rules without notice and comment. The New Rules violate the letter and intent of Section 390.

### The 2010 BLM Rule

43. On May 17, 2010, the BLM issued its New Rule interpreting Section 390. See BLM Inst. Mem. No. 2010-118 (May 17, 2010) (the "2010 BLM Rule"), attached as Exhibit D. The 2010 BLM Rule was made effective upon issuance. Exhibit D at 3. The 2010 BLM Rule turns the 2005 BLM Policy upside down, and amends Section 390 in two fundamental ways. First, the 2010 BLM Rule provides that Section 390 exclusions from NEPA do not apply if "extraordinary circumstances" exist. Exhibit D at 2 (stating that "if extraordinary circumstances exist in relation to the action being considered, then the BLM must either prepare an EA or EIS . . . ."). Second, the 2010 BLM Rule amended the statutory conditions for application of two of the Statutory CXs, added additional conditions not imposed by Congress, and interpreted the Statutory CXs in an arbitrary and capricious way.

44. New Conditions to the Use of Statutory CX2. Section 390 and the 2005 BLM Policy state that there is a rebuttable presumption that an action is excluded from NEPA for: (1) drilling a well at an existing location or well pad, (2) within five years of the existing location or well. See 42 U.S.C. § 15942(b)(2). The 2010 BLM Rule adds a third condition: "Section 390 CX2 may only be used if the specific location and/or well pad site for the proposed drilling was

adequately analyzed in an existing activity-level or project-specific Environmental Impact Statement (EIS) or Environmental Assessment (EA)." Exhibit D at 2. This interpretation flips Statutory CX2 on its head: instead of a categorical exclusion *from* NEPA as provided by Section 390, the BLM now categorically demands that the project has been evaluated *pursuant* to NEPA. See 42 U.S.C. § 15942(b)(2); Exhibit D at 2.

45.     New Conditions to the Use of Statutory CX3. Section 390 and the 2005 BLM Policy provide that there is a rebuttable presumption that drilling an oil or gas well within a developed field is categorically excluded from NEPA when drilling was analyzed in an approved land use plan or "any" environmental document prepared pursuant to NEPA approved within the prior five years. See 42 U.S.C. § 15942(b)(3). But the 2010 BLM Rule states that the drilling must have been reviewed in a certain type of NEPA document: an "activity level or project specific EIS or EA." Exhibit D at 2. The 2010 BLM Rule does not allow Statutory CX3 to be used where the activity was reviewed in an "approved land use plan" or "any environmental document prepared pursuant to NEPA" as provided by Section 390. See 42 U.S.C. § 15942(b)(2).

46.     The 2010 BLM Rule is binding on BLM employees. The 2010 BLM rule forbids the exercise of discretion. It states: "In order to use CX2 and CX3 prior NEPA analysis will *have to have been completed* as specified in this section, and any proposed use of these CXs *will be* subject to extraordinary circumstances review . . . ." Exhibit D at 2 (emphasis added).

## The 2010 Forest Service Rule

47. On June 9, 2010, Deputy Chief Jim Holtrop reversed the Forest Service's prior policy, and issued a new binding rule for regional foresters. See Forest Service June 9, 2010 Letter to Regional Foresters ("2010 Forest Service Rule"), attached as Exhibit E. The 2010 Forest Service Rule was effective upon issuance. Exhibit E at 1. Like the 2010 BLM Rule, the 2010 Forest Service Rule forbids the use of Section 390 categorical exclusions if "extraordinary circumstances" exist. Exhibit E, att. 1 at 3. Unlike the 2010 BLM Rule, however, the 2010 Forest Service Rule does not require prior NEPA review as a prerequisite to utilizing Statutory CX2. Exhibit E, att. 1 at 5-6. The 2010 Forest Service Rule also recognizes that, for purposes of relying on Statutory CX3, the prior analysis can be a NEPA document of "any type" or an include approved land management plan. Exhibit E, att. 1 at 6-7.

48. The 2010 Forest Service Rule is binding on Forest Service employees. The 2010 Forest Service Rule forbids the exercise of discretion. The 2010 Forest Service Rule states: "A review of Extraordinary Circumstances (FSH 1909.15, Chapter 30) *must be made* in considering the use of Section 390 CEs." Exhibit E, att.1 at 3 (emphasis added).

49. The New Rules subvert the letter and purpose of Section 390 and are contrary to the unambiguous language of the statute.

50. The New Rules are abrupt shifts from prior policy. Neither agency provided a reasoned explanation for the policy change.

51. Although presented as mere instructional documents for lower-level line officers, the New Rules are substantive rules of nationwide application that affect individual rights and

22

obligations. The New Rules do not merely provide guidance for the application of Section 390,

they establish binding rules limiting the application of Section 390. The New Rules do not leave

the agencies with any discretion; they bind the agencies to apply Section 390 in accord with the

specific terms of the New Rules.

52.     The BLM did not provide public notice, an opportunity for comment, or respond

to comments prior to adopting the 2010 BLM Rule.

53.     The Forest Service did not provide public notice, an opportunity for comment, or

respond to comments prior to adopting the 2010 Forest Service Rule.

54.     Rather than adhering to the obligation under 5 U.S.C. § 553 of giving notice of

the proposed rule, granting an opportunity to comment, and providing an explanation of the rule

adopted, the BLM and Forest Service simply adopted the 2010 BLM Rule and 2010 Forest

Service Rule in private, with no opportunity for public involvement, and to implement the

unlawful private settlement agreement entered into by the BLM in *Nine Mile Canyon Coalition

et al. v. Steiwig, et al.*

## FIRST CAUSE OF ACTION

*The 2010 BLM Rule and 2010 Forest Service Rule Are Substantive Rules That Were
Promulgated in Violation of the Administrative Procedure Act*

55.     Plaintiff restates and incorporates by reference paragraphs 1-54 above.

56.     The BLM's issuance of the 2010 BLM Rule was final agency action under 5

U.S.C. § 704.

57.     The Forest Service's issuance of the 2010 Forest Service Rule was final agency action under 5 U.S.C. § 704.

58.     The APA requires agencies to adhere to three steps in promulgating rules: (1) notice of the proposed rule; (2) an opportunity for public comment; and (3) an explanation of the rule ultimately adopted. See 5 U.S.C. § 553(b), (c).

59.     The APA's notice and comment requirement does not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure or practice." 5 U.S.C. § 553(b)(3)(A).

60.     The New Rules are substantive rules subject to the requirements of 5 U.S.C. § 553(b)-(c), not interpretive rules, general policy statements, or rules of agency procedure within the meaning of 5 U.S.C. § 553(b)(3)(A).

61.     The BLM committed to order agency employees to ignore Section 390 in an unlawful private settlement of a lawsuit involving a single oil and gas development project in Utah. Neither the proponent of that project, nor the public at large, was involved in negotiating the settlement. Only the BLM and the plaintiffs signed the settlement.

62.     Neither the BLM nor the Forest Service published notice of the proposed New Rule. Neither agency provided an opportunity for public comment. Neither agency provided a reasoned explanation of the New Rules after they were adopted.

63.     The 2010 BLM Rule and 2010 Forest Service Rule are invalid, of no legal effect, and contrary to law because they were promulgated without following the procedures mandated by the APA. 5 U.S.C. §§ 553(b)-(c), 706(2).

## SECOND CAUSE OF ACTION

*The 2010 BLM Rule Violates the Administrative Procedure Act Because it is Contrary to the Plain Language of Section 390(b)(2) of the Energy Policy Act of 2005*

64.     Plaintiff restates and incorporates by reference paragraphs 1-63 above.

65.     The APA requires courts to set aside final agency action that is: "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

66.     The 2010 BLM Rule was final agency action.

67.     Statutory CX2 exempts from NEPA's requirements: "Drilling an oil or gas well at a location or pad site at which drilling has occurred previously within 5 years prior to the date of spudding the well."  42 U.S.C. § 15942(b)(2).

68.     Statutory CX2 is clear and unambiguous.  Congress imposed only two conditions on the use of Statutory CX2 in Section 390: (1) drilling at a location at which prior drilling occurred; and (2) the prior drilling occurred within the last five years. Id.

69.     Section 390 does not require that the drilling subject to Statutory CX2 has been reviewed in a prior NEPA document.  42 U.S.C. § 15942(b)(2)

70.     The 2010 BLM Rule imposes a new third condition on the use of Statutory CX2: the proposed drilling must have been reviewed in a prior NEPA document.  Exhibit D at 2.  The 2010 BLM Rule states that Statutory CX2 "may only be used if the specific location and/or well pad site for the proposed drilling was adequately analyzed in an existing activity-level or project-

specific Environmental Impact Statement (EIS) or Environmental Assessment (EA)." Exhibit D
at 2.

71.     The 2010 BLM Rule forbids the use of Section 390 and Statutory CX2 unless a
condition exists that does not appear in Section 390. The 2010 BLM Rule is an arbitrary and
capricious interpretation of Section 390 under the APA. 42 U.S.C. § 15942; 5 U.S.C. § 706(2).
The 2010 BLM Rule turns the statute on its head: in contrast to the statutory categorically
*exclusion* from NEPA adopted by Congress in Section 390, the 2010 BLM Rule establishes a
categorical *obligation* to conduct NEPA review.

72.     The 2010 BLM Rule's interpretation of Statutory CX3 is arbitrary, capricious,
and not in accordance with the law. See 5 U.S.C. § 706(2).

## THIRD CAUSE OF ACTION

*The 2010 BLM Rule Violates the Administrative Procedure Act Because it is Contrary to the
Plain Language of Section 390(b)(3) of the Energy Policy Act of 2005*

73.     Plaintiff restates and incorporates by reference paragraphs 1-72 above.

74.     Statutory CX3 exempts from NEPA's requirements: "Drilling an oil or gas well
within a developed field for which an approved land use plan or any environmental document
prepared pursuant to NEPA analyzed such drilling as a reasonably foreseeable activity, so long
as such plan or document was approved within 5 years prior to the date of spudding the well."
42 U.S.C. § 15942(b)(3).

75.     Statutory CX3 of Section 390 is clear and unambiguous. Statutory CX3 applies if
the proposed drilling has been analyzed in: (1) "an approved land use plan"; or (2) "*any*

26

environmental document prepared pursuant to NEPA . . . ." 42 U.S.C. § 15942(b)(3) (emphasis added).

76. The word "any" is unambiguous. Any is defined as "one, some, or all indiscriminately *of whatever kind*." Merriam-Webster Collegiate Dictionary 53 (10th Ed.) (emphasis added). Statutory CX3 applies if the proposed drilling has been evaluated in a prior NEPA document *of whatever kind*. 42 U.S.C. § 15942(b)(3). But the BLM restricts the use of Statutory CX3 to only certain kinds of prior NEPA documents.

77. The 2010 BLM Rule is contrary to the plain language of the statute. The 2010 BLM Rule restricts the use of Statutory CX3 to drilling that was analyzed in an "activity-level or project-specific EIS or EA." Section 390 states that the drilling must have been analyzed in "an approved land use plan or any environmental document." 42 U.S.C. § 15942(b)(3). The 2010 BLM Rule and Section 390 are irreconcilable: drilling analyzed in an EA or EIS that was not activity-level or project specific, or that was analyzed in a land use plan, qualifies for Statutory CX3 under Section 390 but not under the 2010 BLM Rule.

78. The 2010 BLM Rule's interpretation of Statutory CX3 is arbitrary, capricious, and not in accordance with the law. See 5 U.S.C. § 706(2).

## FOURTH CAUSE OF ACTION

*The 2010 BLM Rule and 2010 Forest Service Rule Impose Administrative "Extraordinary Circumstances" Limitations on the Use of the Statutory CXs Contrary to Section 390 of the Energy Policy Act of 2005*

79. Plaintiff restates and incorporates by reference paragraphs 1-78 above.

27

80. The 2010 BLM Rule states: "field offices are directed to conduct a review for extraordinary circumstances when considering the use of any of the Section 390 CXs . . . . If extraordinary circumstances exist in relation to the action being considered, then the BLM must either prepare an EA or EIS . . . ." Exhibit D at 2.

81. The 2010 Forest Service Rule states: "A review of Extraordinary Circumstances . . . must be made in considering the use of Section 390 CEs." Exhibit E att. 1 at 3.

82. Congress did not condition the application of Section 390 to situations where no "extraordinary circumstances" are present. 42 U.S.C. § 15942. The "extraordinary circumstances" review required by CEQ regulations for categorical exclusions created by federal agencies does not apply to Section 390.

83. The 2010 BLM Rule and 2010 Forest Service Rule prohibit the use of Section 390 if "extraordinary circumstances" exist in contravention of the unambiguous language of Section 390. The 2010 BLM Rule and 2010 Forest Service Rule are arbitrary, capricious, and not in accordance with the law. 5 U.S.C. § 706(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against all Defendants and provide the following relief:

1. Declare that the BLM violated the APA by adopting the 2010 BLM Rule without following the procedures required by 5 U.S.C. § 553(b), (c).

2. Declare that the Forest Service violated the APA by adopting the 2010 Forest Service Rule without following the procedures required by 5 U.S.C. § 553(b),(c).

28

3.      Declare that neither the Forest Service nor the BLM may condition the application of Section 390, 42 U.S.C. § 15942, on a determination that no "extraordinary circumstances" are present;

4.      Declare that the BLM may not limit the use of Statutory CX2 to drilling proposals that have been previously analyzed in a NEPA document;

5.      Declare that the BLM may not limit the use of Statutory CX3 to drilling proposals that have been previously analyzed in an activity-level or project-specific NEPA document;

6.      Enjoin the Forest Service and BLM from acting in a manner contrary to the declarations listed above;

7.      Award Plaintiff's costs and reasonable attorneys' fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), and any other statute; and

8.      Provide such other relief as the Court deems just and proper.

Respectfully submitted this 21st day of October, 2010.

Mary Throne
Throne Law Office, P.C.
P.O. Box 828
211 W. 19th St.
Cheyenne, WY 82003
Telephone: 307-637-2822
Facsimile: 307-674-6104

Ezekiel J. Williams, pro hac vice
Steven K. Imig, pro hac vice
Ducker Montgomery, Lewis
& Bess, P.C.
1560 Broadway, Suite 1400
Denver, CO 80202
Telephone: 303-861-2828
Facsimile: 303-861-4017

*Attorneys for Plaintiff Western
Energy Alliance*