FILED
U.S. DISTRICT COURT
DISTRICT OF WYOMING

AUG 12 2011

Stephan Harris, Clerk
Cheyenne

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

---

| | |
|---|---|
| WESTERN ENERGY ALLIANCE,<br><br>Petitioner,<br><br>vs.<br><br>KEN SALAZAR, Secretary of the Interior, UNITED STATES BUREAU OF LAND MANAGEMENT, ROBERT V. ABBEY, Director of the Bureau of Land Management, UNITED STATES FOREST SERVICE, and THOMAS TIDWELL, Chief of the United States Forest Service,<br><br>Respondents. | Case No. 10-CV-237F |

---

**MEMORANDUM DECISION AND ORDER**

---

Petitioner Western Energy Alliance (WEA) seeks review under the Administrative Procedure Act of actions taken by the Federal agency respondents (Federal Respondents) in issuing internal agency guidance documents interpreting Section 390 of the Energy Policy Act of 2005 (Section 390). Section 390 established a "rebuttable presumption" that a categorical exclusion (CX) from review under the National Environmental Policy Act

(NEPA) would apply to certain oil and gas development activities on federal oil and gas leases (Section 390 CXs). Specifically, WEA challenges the issuance of a May 17, 2010 BLM Instruction Memorandum No 2010-118 (2010 BLM Memo)[1] and a June 9, 2010 Forest Service letter (2010 FS letter), both of which address and limit the use of Section 390 CXs (collectively, the 2010 Instructions). CAT01070-01073; FS00216-FS00226. WEA argues that the 2010 Instructions are arbitrary, capricious and contrary to law, and constitute substantive rules adopted contrary to public notice and comment procedures required by law. After considering the petition, arguments and affidavits in this matter, the court vacates and enjoins the 2010 Instructions nationwide, because the 2010 Instructions were adopted contrary to public notice and comment procedures required by 5 U.S.C. § 553. The court declines to reach the remaining substantive claims in the petition.

## BACKGROUND

Pursuant to the Mineral Leasing Act, 30 U.S.C. § 181 et seq., as amended by the Federal Onshore Oil and Gas Leasing Reform Act of 1987, 30 U.S.C. § 226(g)-(h) (MLA), the Department of Interior through the BLM and the Department of Agriculture, through the

---

[1] On its face, Instruction Memorandum No. 2010-118 expires September 30, 2011. CAT01070.

United States Forest Service (USFS), exercise complimentary regulatory authority over the development of federal oil and gas resources as follows:

> The Secretary of the Interior, or for National Forest lands, the Secretary of Agriculture, shall regulate all surface-disturbing activities conducted pursuant to any lease issued under this chapter, and shall determine reclamation and other actions as required in the interest of conservation of surface resources. No permit to drill on an oil and gas lease issued under this chapter may be granted without the analysis and approval by the Secretary concerned of a plan of operations covering proposed surface-disturbing activities within the lease area.

The agencies exercise their authority through a staged decision-making process. First, at the "earliest and broadest" stage, the agency develops a land use plan – a Resource Management Plan (RMP) in the case of the BLM and a Forest Plan in the case of the USFS. *See, e.g., Pennaco Energy, Inc. v. U.S. Dep't of Interior*, 377 F.3d 1147, 1151 (10th Cir. 2004). For oil and gas development, the RMP or Forest Plan identifies areas available for oil and gas leasing and the terms and conditions applicable to any leases issued in these areas. 36 C.F.R. § 228.102(c) – (d) (USFS); 43 C.F.R. § 1610 (BLM).

At the second stage, the BLM holds lease sales of parcels of land nominated by the public. 43 C.F.R. §§ 3120.1-2, 3120.3-2. Where the surface is administered by the USFS, the BLM must obtain authorization from the USFS prior to leasing. 30 U.S.C. § 226(h); 36 C.F.R. § 228.102(d). Finally, before lease development, a lessee must submit an Application for Permit to Drill (APD) to the BLM and, if the surface is managed by the USFS, a Surface

Use Plan of Operations (SUPO). 43 C.F.R. § 3162.3-1(c). The agencies must approve the APD or SUPO prior to any surface disturbing operations. *Id.* The BLM oil and gas development process is much more fully detailed in the record at CAT0887.

Like all federal agencies, the Federal Respondents (BLM and USFS) must comply with NEPA procedures, 42 U.S.C. § 4332, before undertaking any major action "significantly affecting the quality of the human environment." *Id.* NEPA requires the Federal Respondents to consider fully the environmental effects of their proposed actions. It is an "essentially procedural" statute, meant to ensure "a fully informed and well-considered decision, not necessarily" the best decision. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 558, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

The BLM NEPA process includes developing alternatives to proposed projects, which are analyzed for their environmental and cultural impacts. BLM typically identifies and analyzes these alternatives using (1) an environmental assessment or (2) a more detailed environmental impact statement when significant environmental impacts appear likely. In some cases, BLM relies on existing NEPA analyses and uses a process called determination of NEPA adequacy (DNA) to document the rationale for concluding that there will be no new significant environmental impact that would require preparation of additional analysis. Alternatively, during review BLM could make a finding that the action falls within an

administrative CX. *Utah Envtl. Cong. v. Bosworth*, 443 F.3d 732, 736 (10th Cir. 2006). CXs are classes of actions which normally "do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1507.3(b)(2), § 1508.4; *see also, Utah Envtl. Cong.*, 443 F.3d at 736.

For administrative CXs, BLM adopted a guidance document that details a checklist of twelve "extraordinary circumstances." BLM staff is required to screen proposed projects against this list when considering the use of an administrative CX. The existence of one or more of these extraordinary circumstances precludes BLM from using a CX, and therefore necessitates reliance on traditional NEPA documents in approving the proposed project. These circumstances include significant impacts to threatened and endangered species, historic or cultural resources, or human health and safety. CAT008.

To address long-term energy challenges, Congress enacted the Energy Policy Act of 2005 (EPAct), in part to expedite oil and gas development within the United States. Pub.L.No. 109-58, 119 Stat. 594 (2005). CAT 0101. Section 390 of the EPAct established five new statutory CXs specifically for oil and gas development:

> (1) Individual surface disturbance of less than 5 acres so long as the total surface disturbance on the lease is not greater than 150 acres and site-specific analysis in a document prepared pursuant to NEPA has been previously completed.

(2) Drilling an oil or gas well at a location or well pad site at which drilling has occurred previously within 5 years prior to the date of spudding the well.

(3) Drilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed such drilling as a reasonably foreseeable activity, so long as such plan or document was approved within 5 years prior to the date of spudding the well.

(4) Placement of a pipeline in an approved right-of-way corridor, so long as the corridor was approved within 5 years prior to the date of placement of the pipeline.

(5) Maintenance of a minor activity, other than any construction of major renovation or a building or facility.

Pub. L. No. 109-58,119 Stat. 594, 747 (2005) (codified at 42 U.S.C. § 15942). Section 390 also contains an important qualification that the listed activities "shall be subject to a rebuttable presumption" that they are categorically excluded from further NEPA review.

Before enactment of Section 390, all oil and gas APDs, SUPOs and sundry notices that proposed additional surface disturbance underwent an environment review process by either the BLM or the USFS. Following enactment of Section 390, any surface disturbances qualifying under the five above-listed activities were excluded from further NEPA review. Also, as opposed to the framework for administrative CXs, both BLM and USFS adopted guidance in 2005 for application of Section 390 CXs, which provided that projects approved under these statutory CXs <u>would not</u> be subject to any screening for extraordinary

circumstances. Questions, disagreements and litigation arose including, among other issues, the decision to not conduct extraordinary circumstances screening. *See, e.g., Nine Mile Canyon Coalition v. Stiewig*, Civ. No. 08-586 (D.Utah).

Recognizing this controversy, the General Accounting Office (GAO) was asked to report to Congress on (1) the extent to which BLM has used Section 390 CXs and the benefits, if any, associated with their use; (2) the extent to which BLM has complied with the EPAct and agency guidance; and (3) key concerns, if any, associated with Section 390 CXs. CAT 0097. In 2009, GAO found that "[a] lack of clarity in Section 390 and BLM's guidance has raised serious concerns about the use of section 390 categorical exclusions." *Id.* Relevant to this case, GAO remarked that there is disagreement as to whether BLM must screen Section 390 CXs for extraordinary circumstances which would preclude their use, and whether their use is mandatory. In addition, GAO remarked that there are vague or nonexistent definitions of key terms in the law.

In response to the GAO report, BLM made a "substantial change" to its Section 390 CX process in the adoption of the 2010 BLM Memo. CAT01926. The 2010 BLM Memo not only addressed the specific findings identified by GAO, but also dealt with issues and concerns raised by other government agencies and environmental groups cited within the

report.[2] CAT0260. For purposes of this case, BLM established a screening process to consider extraordinary circumstances when using any Section 390 CX. Therefore, under the new policy, if a proposed activity presents an extraordinary circumstance, further environmental analysis and documentation would be required in the form of an Environmental Assessment or an Environmental Impact Statement.[3] BLM also interjected a new condition within the second Section 390 CX (CX2),[4] to limit its use only if the specific location and/or well pad site for the proposed drilling was adequately analyzed in an existing activity-level or project specific NEPA document. Finally, BLM eliminated its ability to use

---

[2] In acknowledging that BLM went beyond the GAO findings, one BLM official explained, "we went beyond GAO's recommendations because GAO felt some aspects of CX use were beyond their authority to address and they deferred those issues to Congress. Rather than deferring those issues and other public issues to congress for resolution, we made changes to address concerns that have been public and our concerns for a long time. For example, CX3, basing a CX on a broad land use plan. Congress said to do it, therefore GAO could not say it was wrong. However, we all know that basing a CX on a land use plan is, perhaps, not the best thing to do, so we proposed changes." CAT0821.

[3] Along with this change, BLM settled the *Nine Mile Canyon Coalition* litigation by agreeing, among other things, to issue a new Instruction Memorandum modifying BLM's NEPA Handbook and stating that future Section 390 CXs will not be invoked absent a determination that there are no "extraordinary circumstances" as provided by 40 C.F.R. § 1508.4. CAT0016-17.

[4] The second Section 390 CX excludes from NEPA review "[d]rilling an oil or gas well at a location or well pad site at which drilling has occurred previously within 5 years prior to the date of spudding the well."

the third Section 390 CX (CX3)[5] for actions based solely on a NEPA document associated with a land use plan.

The USFS also changed its prior practices, but did not "unthinkingly" follow BLM's lead. FS0075. Among other changes, the USFS implemented "extraordinary circumstances" screening when using a Section 390 CX.

## DISCUSSION

Federal Respondents argue that WEA lacks Article III standing to pursue its claims for relief because it has failed to demonstrate any "injury-in-fact" as a result of the 2010 Instructions. Article III standing is a "threshold jurisdictional question" that a court must decide before it may consider the merits. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-101 (1998).

Here, WEA asserts standing to sue on behalf of its members. "An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of

---

[5]The third Section 390 CX excludes from NEPA review "[d]rilling an oil or gas well within a developed field for which an approved land use plan or any environmental document prepared pursuant to NEPA analyzed such drilling as a reasonably foreseeable activity, so long as such plan or document was approved within 5 years prior to the date of spudding the well."

individual members in the lawsuit." *Friends of the Earth, Inc. v. Laidlaw Envtl. Sevs.*, 528 U.S. 167, 181 (2000).

Therefore, to establish Article III standing, WEA bears the burden of demonstrating, through its members, that: (1) it has suffered an "injury in fact" that is (a) concrete and particularized[6] and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the defendant's challenged action; and (3) that it is likely, as opposed to merely speculative, that a favorable judicial decision will prevent or redress the injury. *Summers v. Earth Island Inst.*, 555 U.S. 488, 129 S.Ct. 1142, 1149 (2009). This requirement assures that "there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party." *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974). Where such a "real need" does not exist, allowing courts to oversee legislative or executive action "would significantly alter the allocation of power . . . away from a democratic form of government," *Summers, supra*, 555 US at 1149, citing *United States v. Richardson*, 418 U.S. 166, 179, 94 S.Ct. 2940 (1974) (Powell, J., concurring).

---

[6] By "particularized," the court means that the injury must affect the plaintiff in a personal and individual way. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 fn. 1, 112 S.Ct. 2130, 2136 (1992).

Three WEA members, Devon Energy Production Company, L.P., Laramie Energy II, LLC, and QEP Resources, Inc. present affidavits in this case. Doc. 27-10, 27-11, 27-12, 32-13, 32-14 & 32-15. The affidavits state that WEA members intend to submit applications for permits to drill (APDs) on particularized federal oil and gas leases in 2011 and 2012 that will be subject to the 2010 Instructions, and the members will be injured by the delay, expense, and legal risks associated with NEPA compliance. *Id.* In addition, the WEA members argue that their affidavits are sufficient for "procedural rights" standing to protect their concrete interests, and that they need not show immediacy or redressability. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 573 n.7 (1992). Doc. 32 at pp. 8-9. Finally, a WEA director presents an affidavit stating general facts concerning its members along with the claim that "[c]ertain activities conducted by Western Energy members pursuant to their MLA leases are excluded from NEPA review pursuant to the [Section 390 CXs], but not under the [2010 Instructions]." Doc. 27-9.

The court will first consider the affidavits for procedural rights standing under the Administrative Procedure Act, 5 U.S.C. § 553 (notice and opportunity to comment). The affidavits presented to the court are sufficient. The WEA members allege that they expect to submit APDs on specific federal oil and gas leases regulated by either BLM or the USFS, and that some of the APDs will meet the statutory criteria for a Section 390 CX. They

further allege that they will be denied the benefit of receiving the APDs without compliance with NEPA, which will subject the WEA members to additional costs and delays because of the 2010 Instructions.

Federal Respondents argue that WEA does not and cannot show any concrete and particularized injury without a specific oil and gas proposal. Specifically, Federal respondents argue that WEA provides no evidence that processing APDs under the new guidance will increase costs to its members, or take any longer than processing the same APD under the prior guidance. Doc. 31, p. 16; *see also*, CAT00136 (many field office employees viewed "developing new NEPA documentation as more expedient than using a potentially controversial section 390 categorical exclusion that may be litigated").

However, in WEA's reply brief, the WEA members clearly address costs and delays, which statements are supported by the administrative record. Specifically, the record shows that BLM officials advised GAO that while a particular use of a Section 390 CX does not, in most cases, save substantial time, the cumulative time savings from processing multiple actions with Section 390 CXs can be, and has been significant. CAT0119. Another BLM office commented that time savings exist in some situations given that a Section 390 CX affords BLM an ability to avoid cumulative impact analysis and also to avoid responding to public comments. CAT0120. In addition, the BLM Utah State Director commented that the

2010 Instructions would result in "more staff time required and a decrease in the number of APDs processed." CAT01135.

Considering the expected injuries alleged by the WEA members within the affidavits filed with WEA's reply brief, the court concludes that the expected injuries, while general and debatable, are not speculative and are cognizable Article III injuries, particularly considering the government's statements supporting these injuries found in the administrative record.

Federal Respondents also argue that the 2010 Instructions are not reviewable final agency actions for purposes of statutory standing. Specifically, Federal Respondents argue that the 2010 Instructions do not represent the consummation of the agencies' decisionmaking processes for authorizing oil and gas development activities on federal lands. The guidance establishes only the procedures BLM and USFS will follow when reviewing and issuing APDs under Section 390; but it is the decision to authorize an APD that marks the culmination of the agency decision-making process.

As to this statutory standing argument, the court agrees with WEA particularly in the context of a procedural rights challenge to the 2010 Instructions. WEA contests the final agency actions in issuing the 2010 Instructions, not the expected agency actions relating to oil and gas development on federal lands. The record supports only one conclusion. The

Federal Respondents adopted a final, binding and substantive change to, (indeed a 180 degree reversal of), its past practices concerning Section 390 CXs. Under the test established in *Bennett v. Speer*, 520 U.S. 154, 177–78, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997), the 2010 Instructions represent final agency actions. *Id.*, (explaining that to be final, the action must (1) "mark the consummation of the agency's decisionmaking process," and (2) "be one by which rights or obligations have been determined, or from which legal consequences will flow"). Further, "the injury required for standing need not be actualized. A party facing prospective injury has standing to sue where the threatened injury is real, immediate, and direct." *Davis v. Federal Election Comm'n*, 554 U.S. 724, 734 (2008). WEA members need not wait to incur injury before approaching the court for redress. *See, e.g., Summers v. Earth Island Inst.*, 129 S. Ct. 1142, 1149 (2009) (the "threat" of suffering an "injury in fact" confers standing).

Finally, Federal Respondents argue that the doctrine of ripeness counsels that this case is more appropriately considered in connection with a concrete application of the 2010 Instructions rather than through the current facial challenge. While the court agrees with this statement as to WEA's substantive challenges to the 2010 Instructions (see below), the court does not agree that this doctrine should be used to shield the Federal Respondents from procedural (notice and comment) challenges.

14

Moving beyond the standing and ripeness issues, the court will address WEA's rulemaking challenge first. The issue presented with this challenge is whether the 2010 Instructions constitute a "legislative" rule, or a policy statement or "interpretive" rule which can be adopted without notice and opportunity for public comment. Or, as stated by this circuit:

> If a challenged agency action creates a "legislative rule," then full compliance with the APA's notice and comment processes is required. *Mission Group Kansas, Inc. v. Riley*, 146 F.3d 775, 781 (10th Cir.1998). Legislative rules "affect[ ] individual rights and obligations." *Morton v. Ruiz*, 415 U.S. 199, 232, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974). But "interpretive rules, general statements of policy or rules of agency organization, procedure or practice" can be implemented without notice and comment. 5 U.S.C. § 553(b)(A). Interpretive rules must "'be derivable from the statute that it implements by a process fairly to be described as interpretive; that is, there must be a path that runs from the statute to the rule, rather than merely consistency between statute and rule.'" *Mission*, 146 F.3d at 783 n. 8 (quoting Richard A. Posner, *The Rise and Fall of Administrative Law*, 72 Chi.-Kent L.Rev. 953, 962 (1997)).

*Ballesteros v. Ashcroft*, 452 F.3d 1153, 1158-1159 (10th Cir.2006)

For the reasons that follow, the court agrees with WEA and concludes the issuance of the 2010 Instructions violated 5 U.S.C. § 553 (requiring that legislative rules be issued only after public notice and an opportunity for comment).

As noted above, the 2010 Instructions were a complete "about-face" by the Federal Respondents compared to their past practices. Also, the 2010 Instructions bind the Federal

Respondents. Therefore, the 2010 Instructions are not policy statements. They are rules which bind the agency and impose or affect individual rights and duties. *See, e.g., Natural Resources Defense Council v. EPA*, 643 F.3d 311, 320-21 (D.C.Cir. 2011) (*NRDC*). Moreover, contrary to the Federal Respondents' argument, the 2010 Instructions are not interpretive; they are legislative. The Federal Respondents admit the 2010 Instructions are "gap fillers." The Court would go further in its characterization. Applying the standard from *Ballesteros*, there is **no path** from Section 390 to the 2010 Instructions and in some instances there is no obvious consistency between Section 390 and the 2010 Instructions. As legislative rules, the Federal Respondents had no authority to issue the 2010 Instructions without public notice and an opportunity for comment. *Id.* (citing *Am. Mining Cong. v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1112 (D.C.Cir.1993) (stating that where "in the absence of the rule there would not be an adequate legislative basis for enforcement action or other agency action to confer benefits or ensure the performance of duties," the rule is legislative)).

Having concluded that the Federal Respondents are in violation of the Administrative Procedure Act's notice and comment requirement, the Court could simply vacate and end this opinion or reach the substantive claims raised by WEA. For the reasons that follow, the Court will not reach WEA's substantive claims.

The first consideration against addressing WEA's substantive claims is the reluctance of the court to prejudge the public notice and comment process, "the very purpose of which is to give interested parties the opportunity to participate in rulemaking and to ensure that the agency has before it all relevant information." *NRDC,* 643 F.3d at 321 (citing *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1140–41 (D.C.Cir.1995)).

Second, the court agrees with the Federal Respondents' argument that a resolution of the substantive claims would benefit from the specific facts surrounding any future APD or SUPO submittal, and the choices made by government employees in response to those facts. Neither those facts nor the government choices are before the Court, and the Court will not speculate, presume or predict a set of facts to reach the substantive claims.

## CONCLUSION

For the foregoing reasons, the Court VACATES and ENJOINS the May 17, 2010 BLM Instruction Memorandum No 2010-118 and the June 9, 2010 Forest Service letter to the extent that they address and limit the use of Section 390 CXs by: (1) establishing a screening process to consider extraordinary circumstances when using any Section 390 CX; (2) interjecting a new condition within Section 390 CX2 to limit its use only if the specific location and/or well pad site for the proposed drilling was adequately analyzed in an existing activity-level or project specific NEPA document; and (3) eliminating BLM's ability to use

Section 390 CX3 for actions based solely on a NEPA document associated with a land use plan. The court takes this action nationwide, on the basis that the 2010 Instructions, as specifically noted above, constitute legislative rules adopted contrary to public notice and comment procedures required by law. The Court declines to address the substantive claims advanced by WEA.

Dated this 12 day of August, 2011.

NANCY D. FREUDENTHAL
CHIEF UNITED STATES DISTRICT JUDGE